IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GRATZ COLLEGE**,<br><br>                      Plaintiff,<br><br>v.<br><br>**SYNERGIS EDUCATION, INC.**,<br><br>                      Defendant. | Case No. 2:14-cv-06966 |

**DEFENDANT SYNERGIS EDUCATION, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION TO PRECLUDE THE TESTIMONY OF STEPHEN J. SCHERF</u>**

Defendant Synergis Education, Inc., by and through its undersigned counsel, respectfully submits this Memorandum of Law in support of its Motion to Preclude the Testimony of Stephen J. Scherf, expert witness for Plaintiff Gratz College, pursuant to *Daubert* and Federal Rules of Evidence 403 and 702.

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL SUMMARY ................................................................................................ 1

    A. Background ........................................................................................................ 1

    B. Scherf's Expert Testimony ................................................................................. 2

III. LEGAL STANDARD.................................................................................................... 3

IV. STEPHEN SCHERF'S TESTIMONY SHOULD BE PRECLUDED BECAUSE IT IS UNRELIABLE ..................................................................................................... 5

    A. Scherf's Reliance on Enrollment Projections Is Unreliable ................................ 5

        1. Gratz Investment Five-Year Projections...................................................... 6

        2. Synergis One-Year Projections.................................................................... 7

        3. Amalgamated and Extrapolated Projections................................................ 8

    B. Scherf's Calculations of Lost Revenues Is Unreliable ...................................... 10

        1. Lost Revenues for the Master of Arts in Education Program................... 11

        2. Lost Revenues for the Master of Science in Management and the Holocaust and Genocide Studies Programs............................................. 12

    C. Scherf's Calculations of Incremental Costs Is Unreliable ................................. 13

    D. Scherf's Mitigation Analysis Is Unreliable........................................................ 14

V. CONCLUSION............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Calhoun v. Yamaha Motor Corp., USA*,
   350 F.3d 316 (3d Cir. 2003)...........................................................................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)............................................................................................. *passim*

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000).............................................................................................4

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).........................................................................................................4

*Heller v. Shaw Industries, Inc.*,
   167 F.3d 146 (3d Cir. 1999).............................................................................................4

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................................3, 10

*Meterlogic, Inc. v. KLT, Inc.*,
   368 F.3d 1017 (8th Cir. 2004) .........................................................................................7

*In re Paoli R.R. Yard Pcb Litig.*,
   35 F.3d 717 (3d Cir. 1994)...............................................................................................3

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008).............................................................................................4

*Pure Earth, Inc. v. Call*,
   618 F. App'x 119, 2015 U.S. App. LEXIS 11441 (3d Cir. July 2, 2015) ...............................11

*Schneider ex rel. Estate of Schneider v. Fried*,
   320 F.3d 396 (3d Cir. 1994).............................................................................................4

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012).........................................................................................4, 7

**Other Authorities**

Federal Rule of Evidence 403................................................................................................4

Federal Rule of Evidence 702................................................................................................3

## I. INTRODUCTION

Defendant Synergis Education, Inc., ("Synergis") respectfully seeks the preclusion of the testimony of Mr. Stephen J. Scherf, who seeks to opine on behalf of Plaintiff Gratz College ("Gratz") on the amount of damages suffered by Gratz assuming a finding of liability on the claims Gratz has asserted against Synergis.

## II. FACTUAL SUMMARY

### A. Background

Gratz and Synergis entered into the Academic Program Services Agreement ("APSA") on January 24, 2013. Amended Complaint ("Amended Compl."), ECF No. 5, ¶ 10 & exh. A (the "APSA"). Under the APSA, Synergis was required to assist Gratz in developing its adult learning programs, and Gratz was required to retain Synergis as its exclusive contractor for managing those programs and to remit to Synergis a portion of Gratz's student enrollment fees. Amended Compl. ¶¶ 11; APSA §§ 1.1, 1.2. The APSA required Gratz to provide Synergis with immediate written notification of the "occurrence of any fact or circumstance relating to an Event of Deteriorating Institution Condition," such as a material adverse change in Gratz's business or financial condition or prospects or a downgraded status with Gratz's accrediting agency, the Middle States Commission on Higher Education ("Middle States"). APSA §§ 2.14, 9.5.

On November 21, 2013, Middle States placed Gratz on probation for being out of compliance with four accreditation standards: Standard 3 (Institutional Resources), Standard 7 (Institutional Assessment), Standard 12 (General Education), and Standard 14 (Assessment of Student Learning). Amended Compl. ¶ 59 & exh. F (Middle States announcement). Middle States places institutions on probation when "the non-compliance is sufficiently serious, extensive, or acute that it raises concern about one or more of the following: 1. the adequacy of

the education provided by the institution; 2. the institution's capacity to make appropriate improvements in a timely fashion; or 3. the institution's capacity to sustain itself in the long term." Amended Compl., exh. G at 3 (Middle States, Range of Commission Actions on Accreditation). Despite numerous interactions between Synergis and Gratz College personnel after November 21, 2013 and throughout 2014, Gratz never provided written notice (or any notice whatsoever) of its probation to Synergis.

Synergis independently discovered Gratz's probation in July 2014. Amended Counterclaim, ECF No. 50, ¶ 41. Synergis notified Gratz in writing on July 17, 2014, that it was invoking its termination rights under the APSA. Amended Compl. ¶ 54. One week later, on July 24, 2014, Gratz sued Synergis in Pennsylvania state court. *Gratz College v. Synergis Educ., Inc.*, No. 2014-22097 (Pa. Ct. C.P.). Following removal of the case to this Court, Gratz filed its amended complaint in December 2014 alleging claims against Synergis for breach of contract and tortious interference with contract. Amended Compl. at 20, 22-23.

### B. Scherf's Expert Testimony

On August 28, 2015, Gratz served the expert report of Stephen J. Scherf on the issue of damages. Declaration of Harry Moren in Support of Motion to Preclude the Testimony of Stephen J. Scherf ("Moren Decl."), Exh. A ("Report"). On September 25, 2015, Synergis served the expert report of Michael K. Milani on that issue. On October 2, 2015, Gratz served Scherf's rebuttal of Milani's report. Moren Decl., Exh. B ("Rebuttal").

Scherf calculates damages from the breach of contract and tortious interference with contract claims under a theory of lost profits. Report at 5-6; Rebuttal at 17-18. Scherf estimates lost revenues over ten years from three programs: (1) an established Master of Arts in Education program ("M.A. Ed.") that Gratz planned to transition from its legacy partner, the Regional Training Center ("RTC"), to Synergis; (2) a new Master of Science in Management program

2

("MSM") under development by Gratz and Synergis; and (3) expanded marketing of Gratz's Holocaust and Genocide Studies program ("HGS"). Report at 6-9; Amended Compl. ¶¶ 30, 74-75. He bases his analysis on RTC's historical performance of the M.A. Ed. program, a Synergis employee's revenue estimate for the M.A. Ed. program, a Synergis employee's 2014 one-year projection of enrollment for all three programs, and an earlier 2013 five-year projection of enrollment (not prepared by Synergis) for all three programs that assumed Gratz would be acquired by a venture capital fund. Report at 6-8. Scherf also estimates the incremental costs of the lost revenues. Report at 9-10. Scherf offsets his lost profit calculations by estimating the effect of Gratz's mitigation efforts. Report at 10-11.

### III. LEGAL STANDARD

Under Federal Rule of Evidence 702, a court evaluating the admission of expert testimony should consider whether:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule "imposes a special obligation upon a trial judge" to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The *Daubert* gatekeeping obligation applies to all "testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 141 (quoting Fed. R. Evid. 702). The party offering the expert bears the burden of proving admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10; *In re Paoli R.R. Yard Pcb Litig.*,

35 F.3d 717, 744 (3d Cir. 1994).

The Third Circuit considers three principle factors that an expert must satisfy: "qualification, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 1994). First, in order to qualify as an expert, the witness must possess specialized expertise including a broad range of knowledge, skills, experience and training. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). Second, in considering the reliability of an expert's testimony, a court analyses "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012). Third, to satisfy the "fit" requirement, testimony must be "relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., USA*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*, 320 F. 3d at 405).

When making a preliminary determination as to the admissibility of expert testimony a court must engage in a review of the expert's conclusion "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152 (3d Cir. 1999). If a logical connection between the facts the expert's opinion is lacking, a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered and exclude the expert's testimony. *Id*. (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Additionally, Federal Rule of Evidence 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

## IV. STEPHEN SCHERF'S TESTIMONY SHOULD BE PRECLUDED BECAUSE IT IS UNRELIABLE

The Court should preclude testimony from Mr. Scherf regarding the opinions disclosed in his report because it is unreliable. In general, Scherf's report lacks adequate explanations of his analysis beyond conclusory statements. He also fails to explain his methodologies or why they are appropriate to employ in this case. *See Daubert*, 509 U.S. at 592-94 (discussing the "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."). Scherf's entire analysis on the selection of the lost profits model to calculate damages is the following single sentence: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Report at 5. And although Scherf asserts that his calculations apply to both of Gratz's claims against Synergis—for breach of contract and for tortious interference with contract—he offers no guidance on how the calculations independently relate to each claim. *See* Report at 1 (explaining he was engaged to calculate damages relating to both claims); Report at 5-6 (presenting damages in the context of the breach of contract claim only); Rebuttal at 17-18 (clarifying that his calculations also apply to the tortious interference claim).

As explained more fully below, Scherf's opinions are unreliable in several areas: (1) his reliance on two previously prepared projections and unorthodox manipulations of that data; (2) his calculations of Gratz' lost revenues for three academic programs; (3) his calculations of incremental costs; and (4) his treatment of Gratz's duty to mitigate its damages.

### A. Scherf's Reliance on Enrollment Projections Is Unreliable

Scherf's proffered damages model is not based on sufficient data, is not the product of a reliable methodology, and does not reflect a reliable application of the methodology to the facts.

5

His model relies on two sets of enrollment projections and his extrapolation of these projections out to ten years. The resulting model is highly speculative, unreliable, and not probative of the determination of damages in this case.

1. **Gratz Investment Five-Year Projections**

The first set of projections contains enrollment projections spanning five years from 2013 to 2017 for four programs: Jewish Education Programs, Education (including the M.A. Ed. program), Business (including the MSM program), and Health. Report at 7; Moren Decl., Exh. C ("Damages Projection Memo") at Attachment 6 ("Gratz Investment Five-Year Projections"). Contrary to Scherf's assertion that these projections were prepared by Synergis in connection with the APSA, they were prepared by Joshua Pierce as a consultant for University Ventures to assist Gratz prepare to sell itself to University Ventures. Moren Decl., Exh. D (Deposition of Joshua Pierce) at 15:11-22, 102:16-103-13. In this context, Gratz contemplated a significant capital investment by University Ventures that would expand the number and type of programs and degrees offered by Gratz. *See* Moren Decl., Exh. E (Gratz College – Substantive Change Application Submitted to the Middle States Commission on Higher Education (June 1, 2013)) at 4-5. Indeed the enrollment projections that Gratz actually submitted to Middle States are *lower* than those in the document relied upon by Scherf. *Compare id.* at 14 *with* Gratz Investment Five-Year Projections.

Scherf did not explain how the Gratz Investment Five-Year Projections, which were prepared on behalf of Gratz for the purpose of exploring an entirely different business venture with another (much better funded) entity, could be a reliable indicator of the operational and budgetary considerations for the services contemplated in the Gratz-Synergis relationship. Gratz's projections prepared for the purpose of advocating for a potential business investment that was premised on University Ventures injecting millions of dollars in capital (an investment

6

did not come to fruition) is not a "reliable basis" for Scherf's opinion on damages stemming from the Gratz's relationship with Synergis. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (affirming exclusion of expert's damages testimony because the expert "relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based"); *see also Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (affirming exclusion of expert's damages testimony because, in part, he based his analysis on a report that was prepared only as an investment-planning tool), *aff'g Meterlogic, Inc. v. KLT, Inc.*, No. 01-0638-CV-W-SOW, 2003 U.S. Dist. LEXIS 25496, at *8-9 (W.D. Mo. Apr. 24, 2003) ("The Metzler report was pure speculation. It was an analysis of the profits defendant TS might realize by pursuing a venture in the remote copier monitoring business. Plaintiff makes much of the fact that defendants relied on the Metzler report in making business decisions in 1999; however, relying on a speculative report in making investments is far different from determining the actual profits plaintiff lost due to defendants' alleged business activities.").

Scherf also failed to address that the Gratz Investment Five-Year Projections do not include projected enrollment drops/cancellations as do the Synergis One-Year Projections, described below.

### 2. Synergis One-Year Projections

The second set of projections contains enrollment projections spanning one year from 2014 to 2015 for the M.A. Ed., MSM, and HGS programs. *See* Moren Decl., Exh. F ("Synergis One-Year Projections"). Unlike the Gratz Investment Five-Year Projections, Synergis did provide the Synergis One-Year Projections to Gratz in the context of the APSA. This set of projections, however, is not a reliable basis for the determination of damages because it does not reflect the enrollment projections Synergis would have estimated had it known that Gratz had

7

been put on probation by Middle States and that Gratz's long-term viability was in question. As Middle States itself explains, "The Commission places an institution on Probation when, in the Commission's judgment, the institution is not in compliance . . . and that the noncompliance is sufficiently serious, extensive, or acute that it raises concerns about one or more of the following: (1) the adequacy of the education provided by the institution; (2) the institution's capacity to make appropriate improvements in a timely fashion; or (3) the institution's capacity to sustain itself in the long term." Amended Complaint ("Amended Compl."), Exh. G at 3. Synergis executives testified that knowledge that a school is on probation would lower their enrollment projections:

> Part of the focus with Gratz was on the implementation of a new degree program as well as involvement in our master's of education program. The concerns to, I think, strengthen the academic quality of programs and to use that in part as a way to enhance enrollments and the probationary status would have provided an impediment to -- to enrollment efforts.

Moren Decl., Exh. G (Deposition of John Donohue) at 128:19-25;

> I think when a school is on academic probation – any school on academic probation makes it – it changes the nature of the investment and student acquisition and ability to convert for a student who is doing research online about the institution. So it changes the nature of what it takes.

Moren Decl., Exh. H (Deposition of Robert Haimes) at 148:4-10.

### 3. Amalgamated and Extrapolated Projections

Moreover, Scherf's damages model is unreliable in its amalgamation and extrapolation for the Gratz Investment Five-Year Projections and the Synergis One-Year Projections to a calculation of ten years of damages. Scherf does not testify that his methodology of generating ten-year damages calculations from a set of one-year projections and from a speculative set of five-year projections is generally accepted by the relevant scientific community. *See Daubert*, 509 U.S. at 593-94.

Scherf decided to combine the projections in a novel way. He explained:



Report at 8. That is, Scherf adopted Goldstein's methodology, which she described in her lay damages estimates:



Damages Projection Memo at 5. That is, Goldstein identified <u>one</u> enrollment projection common to both the Gratz Investment Five-Year Projections and the Synergis One-Year Projections: the projected enrollment for the MSM program for calendar year 2014-2015, which was ▓▓▓, respectively. Because the Gratz Investment Five-Year Projections did not specify summer enrollment while the Synergis One-Year Projections did, Goldstein decided to add another cohort of speculative students to the Gratz Investment Five-Year Projections, increasing the figure from ▓▓▓. She then calculated that the projection from the 2014 One-Year Projection (▓) was ▓▓ less than her modified projection from the Gratz Investment Five-Year Projections (▓). Scherf adopted Goldstein's method to "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" Report at 8. Scherf applied this ▓ modifier, derived from one data point for the Master of Science in Management program, not only to extrapolate future enrollments for the MSM program but also for the Holocaust and Genocide Studies program. Report at exh. 3 n.1.

Scherf gave no explanation as to why Goldstein's mental gymnastics was an accepted

9

methodology for the projection of future damages. He did not indicate that this methodology had been subjected to peer review and publication. *See Daubert*, 509 U.S. at 593-94. Nor did he explain why this approach was not inherently speculative. He did not conduct any independent analysis to determine if colleges similarly situated experienced similar ten-year growth rates for newly established, untested programs. He merely stated that it was "███████" without offering his own analysis and with no attempt to corroborate that Goldstein's methodology was justified. As such, his reliance on Goldstein's trick is unreliable. This conceptual error, based on a layperson's interpretation of <u>one</u> data point, is compounded throughout Scherf's ten-year damages model for both the MSM and HGS programs.

After amalgamating the two sets of projections for the first four years of the damages period, Scherf then ventured into the uncharted territory of the remaining six years. He assigned growth rates of █ percent for calendar year 2017-2018 and █ percent for the following years. Report at 8. Scherf failed to account for the █ percent growth rate. He arrived at the █ percent growth rate by explaining, without documentation, that the historic *tuition* growth rate was █ percent and therefore, in a logical leap, that the future *enrollment* growth rate should be █ percent. Neither of these growth rates is based on sufficient data or reliable application of a reliable methodology. Scherf has not "employ[e]d in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

### B. Scherf's Calculations of Lost Revenues Is Unreliable

Scherf's report contains meagre descriptions of his lost revenues analysis and calculations for the three academic programs, and few citations, making it difficult to understand and evaluate the data he relied upon and how he arrived at his results. In his calculation of lost revenues for each of the programs, he has "performed an unsophisticated analysis and did not

10

introduce evidence that explained [his opinion] or justified it." *Pure Earth, Inc. v. Call*, 618 F. App'x 119, 2015 U.S. App. LEXIS 11441, at *15 (3d Cir. July 2, 2015).

### 1. Lost Revenues for the Master of Arts in Education Program

In presenting his lost revenues calculations for the Master of Arts in Education program, Scherf first cites an internal April 17, 2014 e-mail from one Synergis employee to another as a "███████████████████████████████████████████████████████████████████████ ███████████████████████████." Report at 6; *see also* Damages Projection Memo at Attachment 4. The e-mail indicates that based on information provided from Gratz, there is a potential for ███████ in revenue for Synergis before expenses from the M.A. Ed. program. *Id.* Scherf mischaracterized the e-mail as yielding an "████████████████████████████ █████████████" when in fact the e-mail clearly states that the enrollment data, for historical years 2012 and 2013, was provided to Synergis by Gratz. Report at 6. Scherf further stated, without explaining his calculation, that this translates into total program revenues of ████████. *Id.* at 6. Although Scherf characterized this estimate as a reasonable basis for a lost revenues calculation, his resulting damages model does not reflect this data and he fails to provide any explanation of how he used this data. *See id.* at exh. 1.

Next, Scherf contends that he "████████████████████████████████████ ███████████████████." Report at 6. Yet he provided no documentation supporting the historical revenues he discussed. *Id.* at 7. Moreover, he did not explain how he used this undocumented data to arrive at his lost revenues calculations.

Scherf also "█████████████████████████████████████████████ ███████████." *Id.* Scherf failed, however, to document or even discuss what those historical tuition rates were and to explain why it would be appropriate to use those historical rates for his future lost profit calculations. Scherf did not consider whether tuition rate increases in the

market are remaining constant, increasing, or declining.

He explained that the enrollment was analyzed in two groups: face-to-face instruction, which was experiencing a decline, and online instruction, which was increasing. *Id.* Again, Scherf failed to document the data he examined and gave no explanation of how this analysis affected his calculations. Moreover, Scherf provided no information supporting the enrollment numbers that appear in his damages model. *See id.* at exh. 1.

### 2. Lost Revenues for the Master of Science in Management and the Holocaust and Genocide Studies Programs

Scherf's lost revenues calculations for the Master of Science in Management and the Holocaust and Genocide Studies programs are similarly inadequately explained and unreliable.

Scherf bases his calculations for the Master of Science in Management program on enrollment projections. Report at 7-8 & exh. 2. The first year of his model is 2013-2014. It is not clear why he included that year in his model; Gratz alleged that it sought to launch the MSM program later, in Fall 2014. Amended Compl. ¶ 41. Moreover, Scherf does not document the source of the enrollment projection for 2013-2014.

Scherf draws the enrollment projection for the second year of his model, 2014-2015 from the Synergis One-Year Projections. As discussed above, his use of this set of projections is unreliable because it does not take into account the fact the Gratz was on probation.

The enrollment projections for the third and fourth years of his model are based on the Gratz Investment Five-Year Projections that, as discussed above, are inappropriate because they were prepared by Gratz for the purpose of advocating for a potential business investment independent of Synergis rather than as part of an operational plan to realize the services contemplated in the Gratz-Synergis relationship. Additionally, as discussed above, his extrapolation of the projections for these years based on the Goldstein reconciliation of the two

sets of projections is unsupported, unproven, and unreliable.

Finally, Scherf calculates the enrollment projections for the fifth year and the sixth through tenth years by applying unsubstantiated annually enrollment increases of ▇ and ▇, respectively.

Scherf's lost revenues calculations for the Holocaust and Genocide Studies program suffer from the same deficiencies for years 2014-2015 and beyond as his calculations for the Master of Science in Management program. Report at 7-8 & exh. 3.

### C. Scherf's Calculations of Incremental Costs Is Unreliable

Scherf's treatment of incremental costs is so cursory and deficient as to render it unreliable. Scherf failed to introduce, explain, and justify the methodology he used to determine incremental costs. Scherf simply identified two nominal incremental costs, ▇▇▇▇▇▇▇ and arbitrarily assigned them values—for the Master of Arts in Education program, ▇ of revenues, and for the Master of Science in Management and Holocaust and Genocide Studies programs, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇— without providing any documentation. *See* Report at 9 & exhs. 2 & 3 nn. 4 & 5. Scherf did not examine the historical expenses incurred by Gratz or their applicability to his lost revenues model. He did not look at Gratz's income statements, cost records, or general ledgers. He did not consider whether Gratz incurred any expenses in generating the ▇ revenue share it had received previously from its partnership with RTC in the M.A. Ed. program.

Moreover, Scherf's analysis of incremental costs is inconsistent with his analysis of costs in his mitigation analysis. In his mitigation model, he accounts for additional costs such as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇. Report at exh. 4. Scherf did not explain the discrepancy of why he did not similarly account for these costs in his incremental cost determination.

13

### D.   Scherf's Mitigation Analysis Is Unreliable

Similarly, Scherf's mitigation analysis is not based on sufficient data, is not the product of a reliable methodology, and does not reflect a reliable application of the methodology to the facts.

First, Scherf does not include any mitigation of lost profits for the Holocaust and Genocide Studies program. Report at 11. Scherf's justified this omission because "███████████████████████████████████████████████████████████████." This conclusory statement does not constitute reliable analysis. Indeed, Scherf does not mention at all a mitigation effort proposed by Gratz President Joy Goldstein in one of the documents Scherf considered. *See* Damages Projection Memo at 3 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████")

Second, although Scherf did include mitigation of lost profits for the Master of Arts in Education and Master of Science in Management programs, his analysis of these mitigation efforts is unreliable. He merely stated the Gratz prepared projections for these two programs, which he "█████████████████████████████████████████████████████████████████" Report at 11. Scherf did not specify the relevant data or even whether he independently reviewed it. Indeed, the only potentially relevant document cited in Scherf's report, a section of the Damages Projection Memo titled "Mitigation Analysis," neither supports nor even mentions the figures in Scherf's mitigation model. *Compare* Damages Projection Memo at 9-10 *with* Report at exh. 4. Scherf did not provide any detail about what he discussed with Goldstein. Scherf did not propose any methodology, and he did not explain his reasonableness analysis. There is simply no way to validate or test his opinion. *See Daubert*, 509 U.S. at 593.

Third, Scherf fails to reliably address the potential for Gratz to mitigate its losses by

14

contracting with another service provider in Synergis's place. Scherf merely mentions and immediately dismisses the idea, noting that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Report at 10. Regardless of whether RTC is a unique and irreplaceable entity, the lost profits stemming with Gratz's failed contractual relationship with Synergis could be mitigated by replacing *Synergis*, not by replacing RTC. In dismissing this obvious mitigation opportunity out of hand, Scherf declined to seriously investigate the marketplace for service providers that could fill the shoes of Synergis in developing the three academic programs for Gratz. Instead, in his rebuttal Scherf, citing a single report on Online Program Management providers, contrasted the capabilities of these providers with those of RTC (rather than of Synergis) in offering the M.A. Ed. program, and found them deficient. Rebuttal at 14. And even in this analysis, Scherf neglected to address whether another service provider could have contracted with Gratz on the MSM and HGS programs. Notably, Scherf does not mention whether he, or anyone at Gratz, even attempted to contact an alternate service provider.

## V. CONCLUSION

Accordingly, Synergis respectfully requests that this Court preclude any testimony from Mr. Scherf regarding the opinions disclosed in his report.

Dated: December 1, 2015

| /s/ | /s/ |
|---|---|
| Roberta D. Liebenberg (PA ID 31738) | Nancy E. Harris (CA Bar No. 197042) (*admitted pro hac vice*) |
| Gerard A. Dever (PA ID 85291) | |
| Ria C. Momblanco (PA ID 201818) | Harry J. Moren (CA Bar No. 284311) (*admitted pro hac vice*) |
| Fine, Kaplan and Black, R.P.C. | |
| One South Broad Street, 23rd Floor | Orrick, Herrington & Sutcliffe LLP |
| Philadelphia, PA 19107 | The Orrick Building |
| Telephone: 215-567-6565 | 405 Howard Street |
| Facsimile: 215-568-5872 | San Francisco, California 94105-2669 |
| E-mails: rliebenberg@finekaplan.com | Telephone: 415-773-5700 |
| gdever@finekaplan.com | Facsimile: 415-773-5759 |
| rmomblanco@finekaplan.com | nharris@orrick.com |
| | hmoren@orrick.com |

*Attorneys for Defendant Synergis Education, Inc.*

# CERTIFICATE OF SERVICE

The document to which this Certificate of Service is attached has been filed electronically this day and is available for viewing and downloading from the ECF System. The electronic mailing of the Notice of Electronic Case Filing generated from the filing of this document using the ECF System constitutes electronic service on the following parties:

> Alan S. Fellheimer
> John J. Jacko, III
> Fellheimer & Eichen LLP
> Two Liberty Place
> 50 South 16th Street, Suite 3401
> Philadelphia, PA  19102
> Telephone:     215-253-6630
> Emails:         alan@fellheimer.net
>                 john@fellheimer.net
> *Attorneys for Plaintiff Gratz College*

Dated: December 1, 2015

> */s/ Harry J. Moren*
> Harry J. Moren
> Orrick, Herrington & Sutcliffe LLP
> *Attorneys for Defendant Synergis Education, Inc.*